**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Madera Technology Master Fund, Ltd., Plaintiff, v. Accolade, Inc., and Rajeev Singh, Defendants. | Civil Action No. 1:25-cv-05863-JHR |

## AMENDED COMPLAINT

Plaintiff Madera Technology Master Fund, Ltd. ("Madera"), by its attorneys N. Read & Co. PLLC, brings this federal securities fraud action against Defendants Accolade, Inc., ("Accolade" or the "Company") and Rajeev Singh ("Singh"), and alleges as follows for its Amended Complaint:

## NATURE OF THE CASE

1. Accolade[1] provided personalized healthcare solutions to employers, health plans, and consumers through a technology platform that allowed users to access healthcare information and services, including virtual care. Founded in 2007, Accolade grew primarily through acquisitions, going public in 2020 and trading on NASDAQ under the symbol ACCD.

2. Accolade operated on a March-through-February fiscal year; its quarters thus ended at the end of May (Q1), August (Q2), November (Q3), February (Q4 – year-end). From the time it went public through August 2023, the Company consistently reported losses in each of the first three quarters of its fiscal year.

---

[1] As a result of a merger, Accolade went private and became a wholly-owned indirect subsidiary of Transcarent, Inc. on or about April 8, 2025

3. Accolade, as noted in its filings with the SEC, priced the majority of its services with a significant portion as a fixed per-member per-month fee and the remainder as a variable fee (the "Performance Guarantee" revenue) earned by achieving healthcare savings resulting from the utilization of its services. Accolade structured its customer contracts such that it regularly recognized a substantial amount of this Performance Guarantee revenue in its fiscal fourth quarter. Accolade recognized the costs for providing the services throughout the year, but the Performance Guarantee revenue was mostly booked in the fiscal Q4. This structure meant that Accolade recognized this performance-related revenue effectively at 100% profit margin.

4. The performance-related revenue typically resulted in the Company recognizing profits in its standalone fiscal Q4 results, on a non-GAAP[2] adjusted-EBITDA[3] basis. From May 2021 through August 2023, Accolade's results fit this pattern: losses in each of fiscal Q1, Q2, and Q3, and profits in Q4.

5. It was thus a bombshell when Rajeev Singh, the Company's Chairman and CEO, said at a healthcare conference in Manhattan on November 29, 2023, that, based on Accolade's balance sheet, existing contracts, and resulting expected revenue, "the business will breakthrough the profitability and [sic] free cash flow positive in the very near term here."

6. Singh made this point at the beginning of a Q&A session with an analyst from Piper Sandler, the firm hosting the conference. And he did so without making any caveats or indication that he was projecting future results rather than describing the Company's financial position.

---

[2] GAAP refers, of course, to "generally accepted accounting principles" applicable to U.S. companies.

[3] EBITDA is the acronym for earnings before interest, taxes, depreciation, and amortization.

7. Later in the Q&A session, Singh repeatedly underscored and reiterated his statement that Accolade was and would be profitable, saying that the Company was "profitable in the back half of this year" and "profitable as a whole for the year next year."

8. Indeed, according to Singh, Accolade's revenue growth put it "in a unique class," to the point that "there are no more unprofitable quarters in the future of our company which we're really excited about."

9. Singh's statements were clear, unambiguous, and not hedged.

10. Steve Barnes, then Accolade's CFO, reiterated these statements in a phone call with Madera personnel on November 30, 2023, the day after the Piper Sandler conference.

11. At no point did Singh or Accolade provide any cautionary language or caveat to Singh's statements. Instead, Singh's comments made clear that, based on his detailed knowledge of Accolade's business and financial position, the Company would be profitable on a quarter-by-quarter basis going forward.

12. Accolade also had a practice of making conservative statements regarding its business and expected revenue, and accompanying those statements with traditional disclaimers. In particular, Accolade customarily gave very conservative financial guidance and overperformed that guidance when issuing actual results. Reasonable investors, including Madera, thus learned from Accolade's behavior pattern and management commentary that its guidance was not a precise predictor of Accolade's actual results nor, for that matter, a reliable indicator of where those results would end up.

13. Indeed, shortly after Accolade issued an 8-K in April 2024 projecting losses for its fiscal Q1, Madera spoke with Barnes about that guidance and the contrast with Singh's prior statements. Barnes reiterated Singh's statement, saying that Accolade would have "no more

unprofitable quarters" and that the firm would be "fully profitable for a full year, not just an individual quarter."

14. As discussed in more detail below, Singh's statements—which Barnes supported when they were made in November 2023 and Barnes, Singh, and other Accolade representatives echoed in April and June 2024—about Accolade's quarter-by-quarter profitability were false, and he knew it. He made these material misrepresentations to pump up Accolade's stock price so that it could pursue a planned acquisition.

15. In January 2025, the Company issued a proxy statement for the planned Transcarent/Accolade merger (the "Proxy Statement"). The Proxy Statement reveals what Singh and Accolade knew in November 2023 but the public did not: well before the Company received any interest from Transcarent, Accolade had been pursuing a strategic acquisition of its own.

16. In the fall of 2023, unbeknownst to the market, the Company was actively working toward acquiring a company described in the Proxy Statement as "Strategic A." To support that effort and anticipated acquisition, Accolade and Singh needed the Company's stock price to remain level or (preferably) go up. On information and belief including based on Accolade's disclosed cash position, Accolade would have had to pay for the acquisition of Strategic A largely with Company stock, just as it had paid for its previous strategic acquisitions of PlushCare, Inc. (announced in April 2021) and Innovation Specialists, LLC (d/b/a 2ndMD) (announced in January 2021) with Company stock.

17. Singh knew that the Company's true financial picture would not support the stock performance he and the Company needed to pursue the acquisition of Strategic A, so he mispresented the Company's revenue and financial position to obtain better stock performance.

18. Singh's comments came just as Accolade's fiscal third quarter was closing; the Company's fourth quarter was expected to be profitable because of the performance-based revenue traditionally recognized in that quarter. Accordingly, the first test of the truth of Singh's profitability statement occurred when Accolade announced its FY 2025 Q1 results in late June 2024.

19. In other words, Singh's comments disguised Accolade's true financial picture for nearly seven months, buying Accolade and Singh much-needed cover and time to inflate the stock's valuation and position the Company for its planned strategic acquisition.

20. As Singh intended, his November 2023 remarks about Accolade's profitability caused its stock price to spike: from November 28, 2023 (the day before the Piper Sandler conference) to January 9, 2024, the Company's stock went up 76.4%.

21. On June 27, 2024, however, the Company had to reveal the truth. Announced that day, Accolade's FY 2025 Q1 results were abysmal and directly contradictory to Singh's November 2023 statements. Rather than the profits Singh had unequivocally said would be realized (statements later echoed by Barnes and others at Accolade), Accolade suffered a $3.3 million loss.

22. The Company's stock price immediately plunged after this corrective disclosure, going down 44.0% on June 28, 2024, the first day of trading after the announcement of the Q1 losses.

23. Madera held a substantial position in Accolade's stock and in derivative contracts tied to the value of Accolade's stock from before November 2023 and for several months after the June 27, 2024, corrective disclosure regarding the Company's business, revenue, and profitability.

24. Madera purchased Accolade stock (or derivative contracts tied to the value of Accolade's stock) on November 29 and December 20, 2023; and on many dates in 2024 before the June 27, 2024, disclosure, including on January 4, 8, 9, 16, and 19; February 1, 9, 20-23, and 26; March 15, 16, 26, and 27; April 24, 25, and 26; May 17, 20-24, 29, and 30; and June 26 and June 27.

25. As a result of the securities fraud committed by Accolade and Singh, Madera suffered losses of approximately $1 million. Madera brings this action to recover those losses.

**PARTIES, JURISDICTION, AND VENUE**

26. Madera is a Cayman Islands private investment fund managed by Madera Technology Advisors, LLC ("Madera Advisors"). Madera Advisors is an exempt reporting advisor under the Investment Advisors Act of 1940 and related rules. During the time period relevant here, Madera held publicly-traded shares of the Company and derivative contracts tied to the value of Accolade's stock, and specifically purchased Company shares and other securities tied to the value and prices of Accolade's stock after and in reliance on the misstatements identified herein.

27. Upon information and belief, Accolade is a Delaware corporation with its principal place of business in Seattle, Washington.

28. Upon information and belief, Singh is a resident of the State of Washington.

29. This Court has jurisdiction over this action under 28 U.S.C. § 1331 because Madera's claims arise under the federal securities laws: Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and related Rule 10b-5, 17 C.F.R. § 10b-5.

30. This Court has subject matter jurisdiction over the state common law claim under 28 U.S.C. § 1332(a)(2) because it is between a citizen of a foreign state and citizens of Delaware

and Washington. The common law fraud claim is also within the Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

31. Personal jurisdiction over the Company and Singh is appropriate under 15 U.S.C. § 78aa because each of them has transacted business in this district and committed fraud in Manhattan.

32. Personal jurisdiction over the Company and Singh is also appropriate here under N.Y. CPLR § 302(a)(2) because each of them committed fraud in Manhattan.

33. Because Madera's claims arise out of securities fraud committed in Manhattan in connection with Accolade stock traded on the NASDAQ, a substantial part of the events and omissions at issue occurred in the Southern District of New York.

## FACTS

### A. The Company's History of Losses

34. Accolade went public in July 2020, raising approximately $254 million at a valuation of $1.2 billion.

35. As a public company, Accolade consistently reported losses in the first three quarters of its fiscal year, but realized non-GAAP adjusted EBITDA profit in its fourth quarter as a result of the Performance Guarantee revenue realized in that quarter. Accolade operated on a March-through-February fiscal year, closing its quarters at the end of May, August, November, and February.

36. From fiscal 2021 through the fiscal third quarter of 2025, Accolade's losses for the first three quarters of each fiscal year were collectively millions of dollars more than the non-

GAAP profit reported in the fourth quarter of each of those years. The table below shows Accolade's reported results for this time period:[4]

| | Fiscal Year 2021 | Fiscal Year 2022 | Fiscal Year 2023 | Fiscal Year 2024 | Fiscal Year 2025 |
|---|---|---|---|---|---|
| Q1 May | - $9.4 million | - $12.8 million | - $15.4 million | - $12.6 million | - $3.3 million |
| Q2 August | - $8.7 million | - $19.4 million | - $13.7 million | - $8.8 million | - $2.8 million |
| Q3 November | - $11.4 million | - $11.9 million | - $10.2 million | - $4.6 million | - $3.8 million |
| Q4 February | + $2.7 million | + $1.8 million | + $2.8 million | + $18.5 million | |
| Full Year | - $26.9 million | - $42.4 million | - $36.5 million | - $7.5 million | |

37. From July 9, 2020, through calendar year 2021, Accolade's stock price fluctuated between $65.25 and $21.75, with an average price of $42.67.

38. Calendar year 2022 proved to be a very tough year for Accolade, as it was forced to announce the loss of a major customer and significant financial losses on April 28, 2022. This caused a one-day drop in the stock price of over 49%.

39. As shown in the table above, Accolade's losses in fiscal 2022 (other than a minimal profit in Q4) and fiscal Q1 and Q2 2023 were significant; those losses caused investors to be concerned about the performance and future of the Company. Announcements of those losses did not, however, cause major drops in Accolade's stock price, because investors were expecting losses within the range of the figures the Company announced.

40. Indeed, by November 2023, Accolade's publicly traded debt was trading at a 20% discount to par, reflecting significant uncertainty and concern in the market regarding the Company's persistent failure to generate profits. The Company's performance also cast doubt on its ability to repay its debt, as of course reflected in the discount on its publicly traded debt.

[4] Accolade's fiscal year means its fourth quarter closes at the end of February of the following calendar year. Thus, Accolade's Q4 2022 closed at the end of February 2022; the Q4 results were reported in April 2022.

41. Given the Company's performance, it is no surprise that in October and early November 2023, analysts following Accolade were modeling negative GAAP earnings for the Company for the next eighteen quarters, through February 2028.

**B. Accolade's History of Conservative Financial Guidance**

42. Shortly after going public, Accolade began issuing quarterly and yearly financial guidance.

43. Accolade's guidance was consistently conservative because, among other reasons, the Company's algorithm for formulating guidance was built to model results in a manner that allowed the Company to consistently outperform its guidance on a quarter over quarter basis, as Singh explained at an investor conference in February 2022.

44. And, indeed, Accolade often reported results better than the top end of the guidance range. Fifteen out of eighteen reported quarters (83.3%), Accolade's results outperformed the guidance range. This record is remarkable in and of itself, but it is particularly notable given that Accolade also repeatedly referred to its business and revenue as being highly predictable. Reasonable investors, including Madera, interpreted this phenomenon as reflecting not that Accolade could not predict its revenue, but rather that Accolade regularly issued intentionally conservative guidance so that it would just as regularly beat that guidance and, as a result, drive its stock price higher.

45. Indeed, Singh and Barnes, Accolade's CEO and CFO respectively, repeatedly emphasized the predictability of the Company's revenue because of the way the Company structured its contracts, the lengths of those contracts, the retention rates, and other fundamental factors. Relatedly, these Accolade executives also touted the visibility of the Company's business and revenue, further underscoring their ability to speak correctly about expected earnings and revenue.

46. For example, on Accolade's earnings call for fiscal year 2023 Q3 (November) held on January 9, 2023, Barnes described the Company's overall structure as adding up to "a diversified *predictable set of business*" (emphasis supplied). Singh also said the Company had achieved "less and less seasonality in our business and more and *more predictability* based on diversification" (emphasis supplied). Singh made a point to emphasize that "sometimes we want to make sure that the market as a whole understand that this is a fundamentally different business more diversified, more capable and with *far more predictability to go forward* -- to go forward revenue streams and P&L" (emphasis supplied).

47. Similarly, on the next earnings call, for fiscal year 2023 Q4 (February), held on April 27, 2023, Barnes noted "Strong new bookings in fiscal year '23 give us *excellent visibility* into fiscal year 2024 and beyond. For those of you who are new to Accolade, our initial contracts are typically three years. So our 33% growth in ARR bookings gives us *good visibility into our current year revenue as well as a solid preview for fiscal year 2025*. Our confidence regarding achieving positive adjusted EBITDA as a business is extremely high" (emphasis supplied). Barnes further explained "we have *very good visibility* to our revenue stream when you think about the model" and thus "coming into any particular year or quarter, we have *strong visibility*" (emphasis supplied).

48. At Accolade's Investor Day on May 8, 2023, Barnes explained the mechanics of Accolade's financial model and said, "we have a very high retention rate in terms of customers and value, that runs at about 95%, which we're retaining 95% of the value of the customer year-to-year." In other words, at that time, Accolade had 95% of its business secured and would need to win only a small amount of new business to achieve its benchmarks.

49. At the Morgan Stanley 21st Annual Global Healthcare Conference held on September 12, 2023, Barnes continued to highlight the predictability of the Company's revenue and the visibility management had into that revenue. In particular, Barnes said that a "great benefit" of "the Accolade business model is that we have really strong visibility forward into our next year guide. So the most recent guidance we gave for the current fiscal year for example the range of $410 million -- the $414 million of revenue, we walk in with visibility to somewhere in the neighborhood of 90% of that revenue, where that comes from is you're -- you may be familiar, we have an annual contract value number that we post, so walking into the year we have just under $310 million of contracted revenue with commercial customers." These statements and the Company's visibility into its revenue were based on, among other things, the Company's "subscription-based model and track record." In other words, Barnes continued to tout the predictability of Accolade's revenue based on its business model and visibility.

50. At the Stephens Annual Investment Conference held on November 15, 2023, Barnes again described Accolade as having a "very visible, predictable revenue model" based on the Company's successful efforts to have customers "sign multi-year contracts," which support predictability and visibility.

51. During the fiscal year 2024 Q3 earnings call held on January 8, 2024, Barnes again mentioned "highly visible contracted revenue." In describing Accolade's consistent ability to exceed its guidance, Barnes explains "This dynamic, which has been consistent year-over-year, along with a track record of consistent historical execution against our performance guarantees has contributed to a high level of confidence in the achievability of our forward guidance."

52. At the 42nd Annual J.P. Morgan Healthcare Conference held on January 11, 2024, Singh went as far as to assert that "We've got extraordinary revenue visibility."

53. Accolade's description of its business as being predictable, having a high level of visibility, and containing a substantial amount of contracted revenue based on existing long-term contracts, would lead a reasonable observer to expect that the Company's reported financial results would be highly correlated with its guidance and other commentary from Company management.

54. Accolade's business model was such that Company management knew, with near certainty, its financials in the short and medium term when the Company provided guidance to investors. In effect, Accolade management knew the answers to the test and touted this at investor conferences and on earnings calls. This "extraordinary revenue visibility," allowed Accolade to employ the practice of issuing ultra-conservative guidance so that it could consistently beat that guidance.

55. Indeed, during the fiscal year 2023 Q4 earnings call held on April 27, 2023, Canaccord Genuity analyst Richard Close succinctly summarized investor expectations of the Company's actual financial results versus guidance, saying to Accolade's management that "since IPO, you guys have been exceeding the top end of the [guidance] range," and thus the Company has been "pretty conservative with your guidance."

56. This very consistent discrepancy between the Company's financial guidance and its reported financial results led investors, including Madera, to understand that Accolade's guidance was far from a precise predictor of the Company's actual results. Rather, investors understood that Accolade would consistently beat its guidance.

### C. Singh's Misstatements Regarding Accolade's Profitability

57. In the fall of 2023, Accolade began confidentially pursuing the strategic acquisition of another company. Given the Company's poor results in 2022 and the first half of 2023, Singh and other members of management were concerned that the Company's stock price and performance would not be strong enough to make such an acquisition possible.

58. The November 2023 Piper Sandler Healthcare Conference offered Singh an excellent opportunity to tell a different story about Accolade. Piper Sandler is a leading equity research and investment banking firm, and its healthcare equity research team covered Accolade at the time.

59. Piper Sandler arranged for a Q&A session led by an equity analyst covering the Company. Singh was joined at the Q&A by Steve Barnes, then Accolade's CFO.

60. At the Q&A Singh immediately pursued his agenda of telling the market that, based on Accolade's current balance sheet and other business fundamentals, Accolade would be profitable very soon. Indeed, in his response to the analyst's very first question, which focused on the Company's recent buyback of $77 million of its convertible note at a discount, Singh said the Company was glad to have taken advantage of the discount at which the notes were trading.

61. Still answering the first question, Singh then pivoted to his agenda: delivering the message that Accolade's "business will breakthrough the profitability and [will be] free cash flow positive in the very near term here."

62. Later in the Q&A, the analyst asked Accolade's CFO about guidance and targets, with a particular focus on the Company's execution on revenue retention and bookings. Singh asked Barnes if he minded if Singh jumped in to handle the question, and Barnes of course deferred to the CEO.

63. Seizing his opportunity to continue to tell the story of Accolade's financial health, Singh noted that he "wanted to call out" a really important point: "We're profitable in the back half of this year and we're profitable as a whole for the year next year." Singh particularly noted that he was speaking about figures "on an adjusted EBITDA basis."

64. A few seconds later, Singh underscored this point, saying that Accolade's revenue growth put it "in a unique class," and proclaiming that "there are no more unprofitable quarters in the future of our company which we're really excited about."

65. Barnes reinforced Singh's comments, responding to Singh's comment that Singh had answered Barnes's question by saying, "No, not at all, you're doing good."

66. Just a few minutes later, the equity analyst leading the Q&A responded positively to Singh's comments, stating "I like the no more unprofitable quarters in the future of our company."

67. Singh and Barnes then provided additional details regarding the Company's current and expected growth, which they described as based on Accolade's ability to drive customer utilization and engagement and grow revenue.

68. Neither Singh nor Barnes qualified Singh's comments in any way, nor characterized them as predictions of potential outcomes where any other outcome was likely. Instead, Singh repeatedly made clear that his view of Accolade's profitability was based on its historical and current business, including its customer relationships and ability to obtain substantial and growing revenue from those relationships.

69. Singh or Accolade also did not provide any cautionary language indicating that future results could differ meaningfully from the comments made by Singh. On the contrary, Singh repeatedly stated in words and substance that his comments were based on the Company's

business activities and financial status, and that based on his detailed knowledge of Accolade, the Company would not report losses in any quarter moving forward.

70. Singh's comments, as supported by Barnes, had their intended effect: Accolade's stock price did not just stabilize, it shot up. From November 28, 2023, (the day before the Piper Sandler conference) to January 9, 2024, the Company's stock went up 76.4%.

71. Barnes repeated and reinforced Singh's comments in a follow-up phone call with Madera on November 30, 2023. During this call, Madera sought to test the veracity and robustness of Accolade's statements at the Piper Sandler conference. In response, Barnes supported and reaffirmed Singh's statements.

72. Madera specifically asked if there were any qualifications to Singh's comments at the Piper conference. Barnes replied that Accolade was not making any caveats or hedges to Singh's comments, which could and should be accepted without qualification. By repeating and reaffirming Singh's statements, Barnes made it clear that Accolade and Singh stood behind Singh's declarations regarding the Company's profitability as unqualified statements of fact.

73. Further, none of Accolade, Singh, or Barnes ever gave any indication at the Piper Sandler conference or thereafter that Singh had misspoken or made any other sort of error. In particular, they never said or suggested that Singh meant to say that Accolade would only be profitable on a full-year, rather than a quarter-by-quarter basis. Instead, Singh (and Barnes) explicitly said that the Company would be profitable on a quarter-by-quarter basis and repeatedly made other statements that provided the same impression.

74. Accolade had the further opportunity to correct or clarify Singh's statements when the Company reported earnings on January 8, 2024, but it did not. Instead of making any

corrections or clarifications, Accolade raised its guidance for the long-term profitability of the Company, an action that served to reinforce and confirm Singh's statements.

75. In the following weeks, Accolade appeared at various investor conferences—including the 42nd Annual J.P. Morgan Healthcare Conference on January 11, 2024, the 26th Annual Needham Growth Conference on January 18, 2024, the 2024 Raymond James Institutional Investor Conference on March 5, 2024, and the Barclays 26th Annual Global Healthcare Conference on March 13, 2024. At these conferences and otherwise, Accolade again failed to clarify or caveat Singh's statements despite ample opportunity to do so.

76. If Singh had innocently misspoken, Accolade should have and most certainly could have corrected the error at the time or in the following weeks and months. But the Company never made any such correction.

**D. Singh's Motivation for his False Statements**

77. As noted, Accolade and Singh were pursuing the acquisition of Strategic A in the fall of 2023 and continuing for several months. This activity was confidential and not known to the public. The details were not disclosed until Accolade issued its preliminary and definitive Proxy Statements regarding the Transcarent transaction in January and February 2025, respectively.

78. Accolade and Singh wanted to position Accolade best to facilitate the acquisition of Strategic A and needed Accolade stock to trade at sufficiently high prices for the Company to finance and execute that deal. Singh saw an opportunity in the November 29, 2023 Piper Sandler conference to achieve that goal.

79. Singh's concerns regarding how investors saw the Company and its financial prospects were thus at the forefront of his mind when he spoke at the Piper Sandler conference.

He was specifically motivated to rebut the negative implications from the Company's poor financial results, unimpressive stock performance, and below-par corporate debt.

80. Singh's practice before the Piper Sandler conference was to make measured, conservative statements and provide cautionary language when speaking about financial results and potential outcomes.

81. But Singh's comments at the Piper Sandler conference were a marked departure from his usual practice. They were bold, definitive, and unquestionably material. They were not accompanied by any cautionary language or caveats.

82. Upon information and belief, Singh's comments were calculated to give a patently false impression of Accolade's finances at a time when Singh and the Company were desperate for good news.

83. Accolade and Singh had the opportunity to correct or clarify Singh's November 2023 misstatements when Accolade reported earnings on January 8, 2024. But nowhere in the prepared remarks or responses to analyst questions did Singh or Barnes qualify, hedge, correct, or clarify Singh's misstatements. On the contrary, Accolade raised its long-term profitability guidance. The combination of lying by omission (by not correcting Singh's statements) and raising profitability guidance caused the Company's stock to rise 29.3% from $11.62 prior to releasing earnings to $15.02 two days later.

84. Indeed, Singh took advantage of the Company's hollow good news to personally profit. Between January 9 and January 10, 2024, capitalizing on the stock price caused by his misrepresentation, Singh sold more than 103,000 shares at an average price of $15.02, generating net profits of more than $1.1 million.

85. Singh's January 2024 sales were executed under a 10b5-1 stock trading plan he adopted on July 20, 2023. The plan's mandatory cooling-off period likely expired between October 18, 2023 and November 17, 2023, just before Singh executed Accolade's repurchase of its convertible notes on November 16, 2023 (an action that alone drove a more than 26.5% increase in the price of Accolade stock) and made his "no more unprofitable quarters" commentary at the Piper Sandler conference on November 29, 2023. During this key time, Singh was also pursuing the potential acquisition of Strategic A, according to the Proxy Statement. Each of these events, including their timing, were under Singh's direction and control as Chairman and CEO. Creating his 10b5-1 insider trading plan prior to effectuating these events allowed Singh to sell Accolade stock—and profit from his own misdeeds—even when Singh would otherwise be prevented from making such trades.

86. Another indication that Singh and others in management at Accolade did not believe his comments at the Piper Sandler conference were truthful is the Company's switch in June 2024 (fiscal year 2025) from receiving stock options as part of their compensation to receiving incentive compensation entirely in the form of Performance Stock Units ("PSUs") and Restricted Stock Units ("RSUs"). The Company had never previously issued only PSUs and RSUs as incentive compensation to executives.

87. Stock options, of course, incentivize management to perform well and realize value from gains in the stock price (stock options at maturity only have value when the stock price rises above the option's exercise price; they are worthless when the stock is below the exercise price). PSUs and RSUs, by contrast, are valuable as soon as they are granted (or vested pursuant to a vesting schedule) and provide substantial upside to recipients even if the stock price goes down.

88. Accolade had historically granted management stock options as part of their incentive compensation and did so in each of its fiscal years 2021, 2022, 2023, and 2024.

89. On or about June 7, 2024, however, Singh and Accolade's management granted themselves two tranches of RSUs, with one set becoming fully vested in fewer than six months (which is highly unusual). Singh and Accolade were aware, of course, that Accolade was about to announce its fiscal year Q1 2025 results. They also knew, or had a high level of belief, that those results would reflect a substantial loss, not the profits that Singh had so confidently and definitively described in November 2023.

90. Indeed, the Company's compensation committee had met in April 2024 and determined it would be inappropriate to pay annual cash bonuses to executives given "lower than expected customer retention in fiscal 2024." Accordingly, Singh and the Company knew that the Company's financial results would not reflect the unqualified financial position Singh had described in his November 2023 comments at the Piper Sandler conference.

91. The accelerated vesting of the RSUs is important and highly unusual. Typically, Accolade utilized a three- and four-year vesting schedule for executive compensation. A multi-year vesting schedule is standard, as the prolonged vesting benefits the Company and its shareholders by promoting executive retention and spreading the cost amortization over a number of years. With a six-month vesting period, the executive would be able to turn the RSU into cash meaningfully sooner (in six months, rather than the usual three or four years).

92. To avoid facing the inevitable personal losses from the upcoming corrective disclosure, Singh and management awarded themselves PSUs and RSUs rather than stock options. If Singh and Accolade had believed what Singh had said in November 2023 was true,

they would have stuck with their historical practice and received stock options, as options provide the executive exponentially more value than PSUs and RSUs as the stock price rises.

93. Awarding PSUs and RSUs also served to materially increase the personal gain for Singh and Barnes under an acquisition of Accolade. If options had been granted on June 7, 2024, they would likely have been issued with an exercise price of $6.88, the most recent closing price. After the release of earnings on June 27, 2024, the stock closed at $3.58, meaning the stock would need to increase nearly 100% before the option would have any value. Given the typical control premium in a sale transaction is 20%, any options granted in early June 2024 would likely be worthless. In contrast, PSUs and RSUs would have value under a sale of the Company at any price.

**E. Accolade's April 2024 8-K Included Negative EBITDA Guidance, but Barnes and Others At Accolade Repeated and Renewed Singh's Misrepresentations**

94. On April 25, 2024, Accolade issued a Form 8-K with a press release announcing the Company's fiscal fourth quarter and full year 2024 results.

95. In that same 8-K, Accolade included financial guidance for its first quarter of fiscal 2025 (FY25Q1). That guidance showed negative EBITDA of between $9 million and $12 million.

96. Although Madera—like other investors following Accolade—knew that this guidance was not an accurate predictor of the Company's actual results, because Accolade's guidance was formulated to be beaten by the Company's actual results, the guidance raised a question of whether Singh's statements about profitability were true.

97. As discussed in detail below, Accolade's representatives made several statements after this 8-K was issued indicating their belief that Singh's representation that the Company

would have profits every quarter going forward was correct, repeating and renewing Singh's "no more unprofitable quarters" misrepresentation.

98. In particular, Todd Friedman, Accolade's Senior Vice President of Investor Relations, arranged a Zoom teleconference for Monday, April 29, 2024, at 4:30 p.m. Eastern (the "April 29 Teleconference"), with required attendees including Barnes, Friedman, Accolade Vice President of Financial Planning and Analysis Brianne Miller, and Kris Drankiewicz and Geoffrey Koide from Madera. The teleconference was titled "ACCD Follow-up" and lasted approximately 30 minutes.

99. After Barnes began the call with discussions of the Accolade team's travels to Company offices in El Paso and Houston, Texas, Madera specifically raised the topic of revenue and EBITDA guidance for the upcoming fiscal year Q1 (May), the apparent divergence from the November 2023 "no more unprofitable quarters" comment, and asked Barnes whether Accolade's actual results would likely be in line with the guidance.

100. Barnes responded by reiterating Singh's November 2023 statement that the Company would have "no more unprofitable quarters." Barnes went on to say that Accolade would be "fully profitable for a full year, not just an individual quarter." Barnes elaborated that Accolade would have profits "no longer for just part of the year, but for the full year." Given the Company's historic pattern of only posting profits in the fiscal year Q4 with losses in earlier quarters and Singh's and Barnes' November 2023 comments, Madera reasonably interpreted Barnes to mean that Accolade would consistently report positive EBITDA each quarter going forward, not just in the Company's fiscal fourth quarter.

101. At the end of his response, Barnes indicated his belief that Singh's November 2023 comments regarding quarter-by-quarter profitability should have been corrected at the time.

This was curious, as he had just reiterated those very same comments. Friedman then followed up to say that the Company had considered "putting out a statement, but it seemed like the models were in the right place."

102. Barnes and Friedman continued the teleconference discussing various drivers for how and why Accolade would report EBITDA profits going forward, including (a) cost savings from moving call centers out to El Paso, Texas; (b) Accolade "doing more and more deals where we book a customer embedded primary care plus emo plus partners, driving those up over the year," (the Company's historical contracts began on January 1, so this meant there was more opportunity for revenue and profits earlier in the fiscal year, including potentially Q1); (c) efforts to "optimiz[e] the portfolio" for profits, including by firing unprofitable customers; (d) potential efforts to expand in the Medicare market; and (e) salespeople "hit[ting] kickers in 4Q", a reference to sales team compensation plan accelerators and the dynamic for sales teams to win a heightened amount of new business as they get increasingly compensated to do so.

103. Barnes noted that Accolade's fiscal year 2024 Q4 results included capitalized commissions being up 83% year over year, a significant departure from FY2023Q4 in which the same figure was down 25%. This meant that Accolade won significant new business in fiscal year 2024 Q4 and thus revenue and profits would begin to flow through the Company's reported financials beginning in fiscal year 2025 Q1 (May). Madera understood this litany of positive business drivers, without discussion of risks or negatives, as Accolade's continued efforts to highlight the high likelihood for upside for Q1 (May) relative to the guidance just provided.

104. Madera's takeaway from this teleconference was that Accolade was continuing its pattern of speaking out of both sides of its mouth: issuing extremely conservative financial

guidance while also leading investors to expect quarterly EBITDA profits that would beat that guidance.

105. Accolade arranged for another follow up Zoom teleconference for June 3, 2024, at 2:30 p.m. Eastern (the "June 3 Teleconference"). Friedman attended the teleconference from Accolade and Kris Drankiewicz attended from Madera. The teleconference lasted approximately 30 minutes.

106. Friedman began the call by noting that Singh was flying to the William Blair 44th Annual Growth Conference (the "Blair Conference"). During the call, Friedman made a point to emphasize (a) the majority of Accolade's revenue comes from its existing installed customer base, and therefore the model is highly predictable, and that less than 10% of next year's revenue needs to be won; and (b) while many customer contracts traditionally begin on January 1, "there are advocacy deals that start April 1," further supporting upside to Accolade's guidance for Q1.

107. Freidman also raised Accolade's announcement on May 21, 2024, welcoming Noom to its Trust Partner Ecosystem. Earlier that day, Friedman had sent an email to Accolade investors saying, "I wanted to bring your attention to a new partnership announced this morning that Accolade has added Noom to the Trusted Partner Ecosystem." This outreach by Friedman, emailing investors to highlight a new partnership, was a notable departure from the Company's standard practices. In the four years since going public, Madera is not aware of any other instance where Friedman sent a similar email.

108. Noom was effectively a reseller or cross-selling relationship, by which Accolade earned revenue when Accolade customers used Noom services. Indeed, on the May 21 call, Friedman explained that if Noom signed a customer "on a per-member per-month basis, then we

get a piece of that," that "this is a utilization based contract", and that Accolade will get "paid for good utilization." This also supported upside relative to Accolade's guidance for Q1.

109. Friedman further mentioned that "customer interest in weight management is very high", a reference to the increase in utilization and upside Accolade had seen from customer usage of GLP-1 and similar treatments. Friedman concluded the teleconference by noting that Accolade's EMO business was becoming "a real selling point" for customers and that "95% of all bookings include EMO." EMO is Accolade's Expert Medical Opinion ("EMO") business, a relatively new business for the Company. Successful uptake of EMO by customers would reasonably be expected to result in significant upside relative to Accolade's guidance for fiscal year Q1.

110. As mentioned by Friedman, Singh presented at the Blair Conference, an investor conference held on June 4, 2024, the day after Madera's call with Friedman. Singh made a formal presentation at the Blair Conference and spoke from prepared materials. He did not appear to speak "off the cuff." Neither at the time nor when the transcript of the remarks were published did Singh provide any disclaimer or other indication that they were predictions of potential outcomes where any other outcome was likely.

111. Singh began his prepared remarks by promoting, yet again, Accolade's visibility and profitability. He specifically noted that Accolade's "underpenetrated market gives us great visibility both in terms of our opportunities for growth and for diversification and long-term profitability of the business. The leverage in the business model is really starting to create, is really starting to demonstrate itself."

112. Singh also noted the expansion of Accolade's gross margins, which, according to him, had led to a corresponding expansion of profits. Singh's specific words were "the profitability of the business has been expanding."

113. After celebrating the Company's efforts to reduce expenses to help generate profits and EBITDA margins of 15% to 20%, Singh concluded that Accolade was "unique" in going "from five customers in 2016 to 1,200 customers in 2024." In addition to reaching these 1,200 customers in "multiple distribution channels," Singh stated that Accolade had reached "$500 million in revenue[]" and "profitability."

114. Accolade had issued its fiscal year 2025 guidance on April 25, 2024. That guidance was for $480 million to $500 million in revenue. At the Blair Conference, just 40 days later, Singh told investors Accolade was a $500 million revenue and profitable business.

115. Here Madera understood, as a reasonable investor would, that Singh's comments indicated that Accolade was, at the time, seeing profits "really start[] to demonstrate" themselves. In other words, that Singh knew and was telling the investing public—based on his review and understanding of Accolade's highly visible business model—that, as of June 4, 2024, Accolade was profitable.

116. Shortly thereafter, Accolade's Friedman arranged yet another call between Accolade and Madera for June 13, 2024, at 2 p.m. Eastern (the "June 13 Teleconference"). The call lasted approximately 25 minutes and was attended by Friedman for Accolade and Kris Drankewicz and Geoffrey Koide for Madera.

117. Friedman led off the call bemoaning Accolade's stock "getting crushed," while also noting that that it is "not just us, everyone is getting crushed." Friedman opined that there were "no catalysts at the moment," meaning he believed there were no current major events or

news that would inspire investors to buy the Company's stock. Friedman supported his view by describing a conversation with Richard Close—a healthcare analyst at Canaccord who covered Accolade—who, according to Friedman, agreed with him that there was "no positive catalyst in the space," and "no change in interest rates, no swing in utilization" news to induce investors to buy the Company's stock.

118. Friedman concluded his preamble of frustration with a culminating remark: "The market will turn at some point; we will get credit for being a $500 million company." Madera understood Friedman's reference to $500 million as a recapitulation of Singh's presentation at the Blair Conference, less than two weeks before: a representation that Accolade understood that its predictable and visible revenue would reach $500 million for FY2025.

119. Friedman transitioned to asking Madera how it felt about Accolade stock in light of the Company doing "$500 million and 50% gross margins." These figures were significantly above the FY2024 numbers, when the Company reported $414 million in revenue and 46.4% gross margins. Friedman answered his own question by saying that Accolade stock would "go from a growth multiple to a profitability multiple." Friedman further noted that Accolade had the "potential to grow profitability at a faster clip."

120. Madera redirected the conversation to discuss the Company's view of retiring Accolade's convertible debt due in April 2026. Friedman noted that the Company and its Board "feeling patient; not in a financial hardship." Friedman concluded saying Accolade is "Pretty comfortable in statements of reaching cash flow positive." Madera understood that positive cash flows and profits are synonymous, mechanically flow together in a company's financial model, and that Friedman was again pointing investors to the profits at Accolade.

121. At no point during the April 29 Teleconference, the June 3 Teleconference, the Blair Conference, or the June 13 Teleconference, did Accolade direct Madera to the company's guidance for EBITDA losses provided on April 25, 2024. Nor did Accolade discuss the possibility of EBITDA losses or the circumstances that could lead to EBITDA losses. In stark contrast, in each of these discussions representatives of Accolade described the Company as profitable, a business doing $500 million in revenue, and provided substantial supporting detail on why the business was profitable.

122. Many of these investor interactions—including both statements to the general public and discussions between Accolade and Madera—took place in June 2024, after Accolade had closed its financial books for the fiscal year Q1 ended May 2024. In those discussions, Accolade representatives already knew the Company's financial results for Q1 and could speak with certainty to the question of the Company's profitability. In each instance, Accolade representatives referred to the Company as profitable. A reasonable investor, including Madera, would conclude only that Accolade was in fact, as per statements provided by Accolade's Chairman and CEO, CFO, and Vice President of Investor Relations, profitable in fiscal year 2025 Q1.

123. Why was Accolade conducting such extensive outreach to investors in June 2024, after it had already closed its FY1Q results and most publicly traded U.S. companies would have been in a quiet period? One major reason appears to be that the Company was deep into merger negotiations in June.

124. As later disclosed in the Proxy Statement, on "June 12, 2024, a board member of Strategic A called Mr. Singh and indicated Strategic A's interest in a strategic transaction with Accolade." The Proxy Statement further discloses that on "June 18, 2024, Strategic A submitted

a non-binding written proposal to acquire Accolade for at least $10.50 in cash per share of Common Stock."

125. These negotiations provided Accolade and Singh with a specific and clear incentive to tout Accolade's profits and revenue to investors, in an effort to create news, drivers, and other inducements to investors to buy the stock to drive the Company's stock price higher. The stock had been languishing, as Accolade's representatives also bemoaned to Madera during this time. Accolade and Singh wanted to end that languishing, induce a bidding war amongst suitors seeking to buy the Company, and drive up the price to benefit themselves.

126. Accolade knew that Madera and other investors are extremely sensitive to statements and conduct by management and companies leading up to the end of a quarter. These actions have even more weight when they are made after the quarter has closed but before the results have been formally announced.

127. It is thus customary for public companies to have limited and relatively anodyne interactions with the investing public in the weeks and days leading up to the announcement of quarterly financial results.

128. Accolade's significant departure from this industry best practice shows that the Company and its management were desperate to influence investor decision making. Their repeated support for the Company's supposed profitability, when they knew the results were otherwise, reflects the Company's knowing misrepresentations or, at best, reckless disregard for the truth, about Accolade's financial results.

**F. The Truth Officially Comes Out and Madera Suffers Losses**

129. On June 27, 2024, Accolade reported its Q1 2025 results: a $3.3 million loss. Accolade's stock price dropped significantly in after-hours trading on June 27, and fell even further on June 28, 2024, the first trading day after this corrective disclosure.

130. In the first half of 2024, Accolade's stock price had been holding relatively steady at $6-7 per share. On June 28, 2024, it closed at $3.58, a drop of 44.0%. Over the next 90 days, Accolade's stock price stayed in that range, with an average trading price of $3.91.

131. This precipitous decline in Accolade's stock price was markedly different from market reactions to Accolade's announcements of losses in earlier quarters, including announcements of losses of similar size. In those prior quarters, Accolade's stock price would increase or take a modest hit when the Company announced losses for the quarter. The tremendous drop in late June 2024 shows that the market was reacting not to a bad quarter, but to the revelation that Singh's comments in November 2023 were false, as were Accolade's subsequent statements to investors regarding the Company's profitability during the April 29 Teleconference, the June 3 Teleconference, the Blair Conference, and the June 13 Teleconference.

132. Accolade's performance remained inconsistent with Singh's statements until the merger with Transcarent closed in April 2025. Indeed, Accolade reported EBITDA losses in each of its fiscal Q1, Q2, and Q3. Singh knew that his misstatements would prop up the stock price, which he and Accolade needed while they explored potential acquisitions and other capital market transactions, and when the truth was revealed, that support melted away.

133. The corrective disclosure in June 2024 and resulting drop in Accolade stock value led to Accolade becoming an acquisition target, which ultimately concluded in Transcarent acquiring Accolade.

134. Immediately prior to the June 27, 2024, corrective disclosure, Madera held more than 383,240 shares of common stock and derivative contracts for 587,700 shares in Accolade, for a total value of more than $6.2 million. Accolade's corrective disclosure immediately caused

a more than 44.0% decline in the Company's stock and cemented the 100% decline in certain of the Company's derivative securities. For purchases made from November 29, 2023, through June 27, 2024, Madera's losses are approximately $992,094.

135. In the alternative, the release of the 8-K on April 25, 2024, caused a 14.2% drop in Accolade's stock price. If that release is deemed the corrective disclosure, Accolade's damages for stock and options purchased from November 29, 2023, through April 25, 2024, are approximately $521,086.

**FIRST CAUSE OF ACTION**
**SECURITIES FRAUD – SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5**
**AGAINST ALL DEFENDANTS**

136. Madera repeats and realleges the allegations in paragraphs 1 through 135, as if fully set forth herein.

137. Singh made material misstatements on November 29, 2023, at the Piper Sandler Healthcare Conference, as described in detail above.

138. Barnes repeated and reaffirmed Singh's statements, without any caveat or qualification, during a phone call with Madera on November 30, 2023.

139. Singh's statements were not accompanied by any cautionary statements or caveats of any kind, and they were reaffirmed without qualification by Barnes, Accolade's CFO, just one day later.

140. Singh was Accolade's Chairman and CEO when he made these statements. They were unquestionably made on behalf of Accolade. Barnes was present when Singh made the statements. Barnes supported and endorsed Singh's statements, further underlying that Singh spoke on behalf of the Company without qualification.

141. As discussed in detail above, Singh, Barnes, and other representatives of Accolade repeated and underscored these statements after November 2023, including after the Company issued its April 25, 2024, 8-K.

142. Singh's statements were material. As a general matter, whether a company will be profitable in any quarter is a core question any reasonable investor would consider important. And Accolade's specific history of unprofitable quarters (other than the fourth-quarter outliers discussed above), meant that Singh's declaration that the Company would not have any more unprofitable quarters was tremendously meaningful to Madera and the market.

143. Madera heard and relied on Singh's statement by buying Accolade stock (and making investments in derivatives tied to Accolade's stock price) and not selling stock it had acquired, as it believed that Singh was telling the truth about Accolade's financial performance and position.

144. Further, reliance can be presumed because Accolade's stock traded on the public market at NASDAQ.

145. Singh knew or should have known that his statements were false or misleading. He was well aware of the details of the Company's business and prospects. He also had a substantial and specific motivation to prop up the Company's stock price, as he and Accolade were pursuing acquisitions and other strategic transactions.

146. By misrepresenting Accolade's financial position in late November 2023, Singh effectively bought himself and the Company nearly seven months of goodwill and support for Accolade's stock price—enough time to hopefully execute Singh's planned acquisition of Strategic A, and enrich himself in the event that acquisition did not come to fruition (the switch

to PSUs and RSUs)—because investors would not be able to test the truth of his statement until Accolade reported its fiscal year 2025 Q1 results in late June 2024.

147. When Accolade made its corrective disclosure on June 27, 2024, Madera suffered approximately $1 million in losses. Those losses were proximately caused by the securities fraud committed by Singh and Accolade.

**SECOND CAUSE OF ACTION**
**COMMON LAW FRAUD**
**AGAINST ALL DEFENDANTS**

148. Madera repeats and realleges the allegations in paragraphs 1 through 147, as if fully set forth herein.

149. Singh made material misstatements on November 29, 2023, at the Piper Sandler Healthcare Conference, as described in detail above.

150. Barnes repeated and reaffirmed Singh's statements, without any caveat or qualification, during a phone call with Madera on November 30, 2023.

151. Accolade and Singh knew or should have known that these statements were false.

152. Accolade and Singh intended that Madera and other investors would rely on their misstatements, and were specifically motivated to cause such reliance for all of the reasons discussed in detail herein.

153. Madera reasonably relied on these misrepresentations when deciding to purchase securities issued by Accolade or otherwise tied to Accolade's stock price.

154. Further, Madera continued to hold Accolade stock and option contracts in reliance on these misrepresentations.

155. If Madera had known the truth, it would not have acted as it did in holding and purchasing these Accolade securities.

156. Defendants' fraud caused Madera to suffer substantial damages.

157. Including its claims based on holding securities in reliance on Defendants' fraud, Madera suffered more than $4.8 million in losses.

## JURY DEMAND

Madera hereby demands a trial by jury of all issues in this action triable by a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Madera respectfully requests judgment against Accolade and Singh as follows:

a. Awarding Madera damages for Defendants' securities fraud in an amount to be determined at trial;

b. Awarding Madera damages for Defendants' common law fraud in an amount to be determined at trial;

c. Ordering Defendants to pay Madera's reasonable attorneys' fees and litigation costs; and

d. Awarding such other, further, and additional relief as the Court deems just and appropriate.

Dated: October 10, 2025
New York, New York

N. READ & CO. PLLC

By: /s Nathaniel P. T. Read

Nathaniel P. T. Read
nread@readandco.com

260 Madison Ave. 16th Floor
New York, NY 10016
Phone: (212) 750-3771

*Counsel for Plaintiff Madera Technology Master Fund, Ltd.*